J-S93016-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: E.M.Z., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: T.M.S., MOTHER | No. 1986 EDA 2016 |

Appeal from the Decree dated May 25, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000406-2016
CP-51-DP-0002507-2013

| IN THE INTEREST OF: M.M.Z., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: T.M.S., MOTHER | No. 1988 EDA 2016 |

Appeal from the Decree dated May 25, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000407-2016
CP-51-DP-0002664-2014

BEFORE:  DUBOW, J., SOLANO, J., and PLATT, J.[*]

MEMORANDUM BY SOLANO, J.:         **FILED JANUARY 23, 2017**

T.M.S. ("Mother") appeals from the May 25, 2016, orders granting a petition by the Department of Human Services ("DHS") for involuntary

_____

[*] Retired Senior Judge assigned to the Superior Court.

termination of her parental rights to her son, E.M.Z., born May 2013, and her daughter, M.M.Z., born November 2014 (collectively, "the Children"). Upon careful review, we affirm.

Prior to the births of the Children, Mother already had six other children in placement thorough DHS. Family Court Opinion dated Sept. 8, 2016, at 3, 6, 8, 12; DHS Petition for Involuntary Termination of Parental Rights and for Goal Change to Adoption ("Petition"), dated May 6, 2016, at 11-12. After the birth of the sixth child, DHS requested that Mother undergo a Parenting Capacity Evaluation, which she did on September 4, 2012. At that time, Mother was diagnosed with opioid abuse, sedative abuse, and mood disorder. Petition at 14.

E.M.Z. was born in May 2013 at 34 weeks gestation and weighed 7.07 pounds at birth. Mother had no prenatal care. Petition at 11. That month, DHS received a General Protective Services report[1] stating that Mother tested positive for amphetamines, benzodiazepines, opiates, marijuana, and oxycodone at the time of E.M.Z.'s birth. Mother contended that she took some pills because she was in pain. *Id.* Nevertheless, Mother also admitted that she has abused pills and marijuana and that she had participated in prior drug treatment in West Chester in 2009. *Id.*

---

[1] The family court determined that this report was valid and credible. Family Ct. Op. at 3.

On December 19, 2013, a dependency petition was filed as to E.M.Z. On January 8, 2014, following a hearing, the family court held that E.M.Z. was dependent, but it allowed E.M.Z. to remain in Mother's physical custody, subject to DHS's supervision.

On February 20, 2014, the family court held a permanency review hearing and again allowed E.M.Z. to remain in Mother's physical custody. The next day, a family service plan meeting was held, and multiple objectives were established, including: (1) Mother will refrain from illicit drug use; (2) Mother will comply with drug and alcohol treatment recommendations and sign the appropriate release forms for DHS to assess her progress; (3) Mother will enroll in and attend parenting classes; (4) Mother will provide E.M.Z. with adequate supervision at all times; (5) Mother will not leave E.M.Z. alone at any time; (6) Mother will make sure that E.M.Z. is left only with responsible caretakers; and (7) Mother will ensure that E.M.Z.'s basic needs (*e.g.,* meals, clothing, and routine medical care) are met. Petition at 11.

On June 4, 2014, another permanency review hearing was held, and Mother was again permitted to retain physical custody of E.M.Z., under DHS's protective supervision. At this time, Community Umbrella Services ("CUA") began working with Mother. Petition at 11. The family court described Mother's response to CUA as "cooperative at first." Family Ct. Op. at 5. "Later, however, [Mother] failed to allow the CUA case manager to

assess E.M.Z.'s safety and failed to respond to the CUA case manager's numerous outreach attempts." *Id.* Many times, it appeared to the CUA case manager that people were moving within the home, but no one answered the door when the CUA case manager knocked. Petition at 11. The CUA case manager became increasingly concerned about E.M.Z.'s safety while in Mother's care. The family court stated, "While E.M.Z. was in Mother's care, Mother failed to ensure that E.M.Z. received proper medical care and failed to address [E.M.Z.'s] developmental needs." Family Ct. Op. at 5; *see also* Petition at 11.

In November 2014, DHS received another General Protective Services report: Mother had given birth to M.M.Z. and had again tested positive for amphetamines, benzodiazepines, and opiates; M.M.Z. had also tested positive for these drugs and appeared to be "stretched and flaccid." Petition at 11-12; *see* N.T. at 10-11. Mother told DHS that she had prescriptions for all of the substances that she was taking, but she could not provide those prescriptions for verification. *Id.* at 11. Again, Mother had no prenatal care for this pregnancy. *Id.* Mother also told her DHS supervisor that the electricity and gas were not functioning in her home. *Id.* at 12.

On the same day as M.M.Z.'s birth, DHS placed E.M.Z. in the home of E.M.Z.'s maternal grandmother, P.P. ("Maternal Grandmother"), who had cleared criminal and child abuse searches, and DHS implemented a safety plan. N.T. at 13-14; Petition at 12. The DHS social worker handling the

case believed that Maternal Grandmother would provide for E.M.Z.'s health, safety, and basic needs. N.T. at 13-14. Newborn M.M.Z. remained in the hospital at this time. *Id.*

Less than a week later, DHS learned through its hotline that Maternal Grandmother planned to visit her boyfriend in another county for four days; DHS also discovered that Maternal Grandmother regularly visited her boyfriend overnight every Wednesday and Saturday. N.T. at 14-16. During those visits, Maternal Grandmother planned to leave E.M.Z. in Mother's care. Family Ct. Op. at 7 (citing Petition at 12). The next day, "DHS visited Maternal Grandmother's home. E.M.Z. was in the care of Mother, who appeared to be under the influence of drugs and/or alcohol." *Id.* E.M.Z. was dirty and smelled foul. N.T. at 15.

Later that day, DHS obtained an order of protective custody for E.M.Z. and placed E.M.Z. with a foster care agency, Asociacion Puertorriquenos En Marcha ("APM"). The next day, DHS learned that M.M.Z. was to be discharged from the hospital, and DHS therefore obtained a protective custody order for M.M.Z. and placed M.M.Z. with the APM agency. Petition at 12. APM then placed the Children in a pre-adoptive home. Family Ct. Op. at 7 (citing Petition at 12); N.T. at 19.

The following day, a shelter care hearing was held, and the family court agreed that the Children should not be returned to Mother's home. The court gave legal custody of the Children to DHS and granted Mother

supervised visitation with the Children twice weekly. On December 3, 2014, following an adjudicatory hearing for M.M.Z. and a permanency review hearing for E.M.Z., the family court found M.M.Z. dependent. The court continued E.M.Z.'s legal custody with DHS and continued E.M.Z.'s placement in foster care through APM. Family Ct. Op. at 8.

Also on December 3, 2014, Mother tested positive for amphetamines (twice the legal limit), benzodiazepines (quintuple the legal limit), and opiates (sextuple the legal limit). Ex. DHS-5; Petition at 13. Mother was then referred to the Wedge Medical Center in the Frankford section of Philadelphia for an outpatient dual diagnosis treatment; however, Mother never attended this treatment. Ex. DHS-5; Family Ct. Op. at 9.

Permanency review hearings were held on February 12, 2015, and May 13, 2015, and at both hearings the family court ordered that legal custody remain with DHS. Family Ct. Op. at 9-10. During the February 12, 2015 permanency review hearing, the family court concluded that Mother was not enrolled in drug and alcohol treatment and referred Mother to the Clinical Evaluation Unit ("CEU") of DHS for a full drug and alcohol screen. Ex. DHS-5; Family Ct. Op. at 9-10; Permanency Review Orders, 2/12/15, at 2. At the time of the March 13, 2015 hearing, Mother had been administratively discharged from Wedge for non-attendance, but had enrolled in an inpatient drug and alcohol treatment program at Interim House, Inc., a treatment center for women in Philadelphia. Ex. DHS-5;

Family Ct. Op. at 10; Permanency Review Orders, 5/13/15, at 2. However, sometime thereafter (the record is unclear as to the exact chronology), Mother left Interim House and returned to outpatient treatment through Wedge. *See* N.T. at 21.

On June 17, 2015, a single case plan meeting was held with respect to both Children, and the following objectives for Mother were established: (1) to participate in future family meetings; (2) to participate in drug and alcohol treatment; (3) to request an Intensive Outpatient Program with CEU while inpatient care is pending approval; (4) to cooperate, to comply, and to participate with an inpatient drug and alcohol treatment program; (5) to attend a Behavioral Health System assessment and to participate in any recommended mental health treatment; (6) to seek, to establish, and to maintain adequate housing; and (7) to maintain scheduled visitation with the Children. Family Ct. Op. at 10-11; Petition at 14.

Additional permanency review hearings were held on August 7, 2015, November 5, 2015, and February 3, 2016, and the family court continued to keep legal custody of the Children with DHS. Family Ct. Op. at 11. Meanwhile, on November 10, 2015, Mother left Wedge's drug and alcohol treatment program without having successfully completed it. N.T. at 21, 44. At the February 3, 2016 review hearing, the court referred Mother to CEU for an immediate drug assessment and drug screen, with three additional

random drug tests to be performed before the next court date on May 25, 2016. Family Ct. Op. at 12; Permanency Review Orders, 2/3/16, at 2.

On May 6, 2016, DHS filed a petition to terminate Mother's parental rights to the Children and a petition for a goal change to adoption. ***See generally*** Petition. On May 25, 2016, the family court held a hearing on both petitions, during which it heard testimony from DHS Supervisor/Social Work Investigator Melissa Migliazza, N.T. 9-19; CUA Case Manager Ernesto Hill, ***id.*** at 19-40[2]; Mother, ***id.*** at 40-44; and Laura Hershel,[3] a representative of Mother's health insurance agency, ***id.*** at 44.[4]

Ms. Migliazza testified that she had witnessed Mother slurring her speech and repeatedly opening and closing her eyes while E.M.Z. was in Mother's care. N.T. at 14-16; ***see also*** Family Ct. Op. at 14. These observations convinced Ms. Migliazza that Mother was under the influence of drugs and/or alcohol. N.T. at 15.

Mr. Hill, the Children's case manager at the time of the hearing, testified that Mother had never presented a home that could be assessed for

_____

[2] According to the notes of testimony for May 25, 2016, when asked to state his name for the record, Mr. Hill gave his first name as "Ernest." N.T. at 19. However, all other references to Mr. Hill in the record give his first name as "Ernesto."

[3] Ms. Hershel is not listed on the index of witnesses in the notes of testimony. N.T. at 2.

[4] The family court also heard testimony for a permanency review with respect to Mother's other six children at that same hearing. N.T. at 47-60.

reunification and "currently" was not in a drug and alcohol program. N.T. at 20; Family Ct. Op. at 14-15. To the best of his knowledge, Mother had never successfully completed any drug and alcohol treatment program. N.T. at 21. He added that, although Mother had attended all supervised visits with the Children – which he had observed for a year prior to the hearing — he would not classify their interactions as a parent-child bond. *Id.* at 19-27. He believed it would be in the best interests of the Children if Mother's parental rights were terminated, because the Children "deserve permanency." *Id.* at 27-28. He testified that the Children have a "tremendous" bond with their pre-adoptive family and would not suffer any irreparable harm if Mother's parental rights were terminated. *Id.* at 28. The family court found Mr. Hill's testimony to be credible. Family Ct. Op. at 18.

Mother testified that she was living with a boyfriend and was unemployed but looking for employment. N.T. at 41-42. She asserted that she was receiving drug and alcohol treatment at "St. Joe's" and again at Interim House, but she could not present any proof of this alleged treatment. *Id.* at 41-42, 44. Ms. Henshel testified that Mother's health insurance had not paid for any drug or alcohol treatment for Mother since November 2015. *Id.* at 44.

At the conclusion of the hearing, the family court granted the petition to terminate Mother's parental rights to the Children. For E.M.Z., the family court terminated parental rights pursuant to 23 Pa.C.S. § 2511(a)(1)-(2),

(5), (8) & (b). N.T. at 46. For M.M.Z., the family court terminated parental rights pursuant to 23 Pa.C.S. § 2511(a)(1)-(2) & (b) only, explaining that, because M.M.Z. entered into DHS's custody immediately after her birth, she was not "removed from the care of the parent," as required by 23 Pa.C.S. § 2511(a)(5) and (8). *Id.* The family court also changed the Children's permanency goal to adoption. N.T. at 45-46.[5]

On June 22, 2016, Mother filed two notices of appeal (one for each of the Children) with statements of matters complained of on appeal. On July 12, 2016, this Court consolidated the two appeals *sua sponte*. Mother presents three issues for our review:

> I.      Did the lower court err when it found that the Department of Human Services (DHS) by clear and convincing evidence has met its burden to terminate Appellant's parental rights pursuant to 23 Pa. C.S.A. § 2511 (a)(1), § 2511 (a)(2), §2511 (a)(5), and § 2511 (a)(8)?
>
> II.     Did the lower court err when it found that the termination of Mother's parental rights was in the Child's best interests and that DHS had met its burden pursuant to 23 Pa. C.S.A. § 2511 (b)?
>
> III.    Did the trial court err in changing the permanent placement goal from reunification to adoption?

Mother's Brief at 2.

---

[5] The court's hearing also dealt with termination of the parental rights of the Children's father. Following the hearing, the father voluntarily relinquished his parental rights. Family Ct. Op. at 1 n.1.

- 10 -

We consider Mother's first two issues in light of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is on the petitioner seeking termination to prove by clear and

- 11 -

convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are met. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, the family court found that there was sufficient evidence to terminate Mother's parental rights to E.M.Z. pursuant to 23 Pa.C.S. § 2511(a)(1)-(2), (5), (8) & (b), and to M.M.Z. pursuant to 23 Pa.C.S. § 2511(a)(1)-(2) & (b). We will affirm if we agree with the trial court's decision as to any one subsection of 23 Pa.C.S. § 2511(a), along with subsection (b). ***In re B.L.W.,*** 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), ***appeal denied***, 863 A.2d 1141 (Pa. 2004); ***see In re N.A.M.***, 33 A.3d 95, 100 (Pa. Super. 2011). Here, we affirm the trial court's decision to terminate Mother's parental rights with respect to each Child under Section 2511(a)(2) and (b):

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: . . .
>
>> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. . . .
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(a)(2), (b). Parental rights may be terminated under Section 2511(a)(2) if three conditions are met:

(1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Geiger*, 331 A.2d 172, 174 (Pa. 1975).[6]

On appeal, Mother argues that the evidence does not support termination under Section 2511(a)(2) because, "[a]lthough [Mother] has gone about the re-unification efforts in her own way, she has taken positive steps towards meeting her Single Case Plan objections." Mother's Brief at 7. Mother contends that "[t]he trial court erred when it found that [DHS] met its burden by clear and convincing evidence to terminate Mother's parental rights pursuant to 23 Pa. C.S.A. §2511(a)[(2)]." Mother's Brief at 6.

Section 2511(a)(2) first requires a showing of the parent's "repeated and **continued incapacity**, abuse, neglect or refusal" to render care. *Geiger*, 331 A.2d at 174 (emphasis added). The family court addressed

---

[6] The language in Section 2511(a)(2) is the same as that of its predecessor, Section 311(2) of the Adoption Act of 1970, which was cited in *Geiger*, 331 A.2d at 174. *See In re A.D.*, 93 A.3d 888, 896 (Pa. Super. 2014) (re-affirming *Geiger* test in terminating parental rights pursuant to Section 2511(a)(2)).

this component, stating: "Testimony provided by the agency personnel was credible and clearly presented facts that Mother was **continuously** using drugs and did not complete treatment plans that were established." Family Ct. Op. at 18 (emphasis added). The record reveals that Mother's continuous drug addiction was established by: her positive tests for amphetamines, benzodiazepines, and opiates in May 2013, November 2014, and December 2014;[7] her own admission to ingesting painkillers for which she could not produce prescriptions; Ms. Migliazza's firsthand observations of Mother; and Mother's failure to complete any drug and alcohol treatment program. Family Ct. Op. at 14-15; N.T. at 10-11, 15, 20-21; Petition at 11-12. The family court found that her habitual drug abuse rendered Mother "**incapable** of parenting." Family Ct. Op. at 18 (emphasis added). *Cf. In re C.L.G.*, 956 A.2d 999, 1006-07 (Pa. Super. 2008) (*en banc*) (mother's drug-related issues continued to impact child and precluded mother from properly caring for child). The record supports the court's determination. Thus, the family court properly found Mother's continued incapacity pursuant to the first element of subsection 2511(a)(2).

Subsection (a)(2) next requires that the actions of the parent "have caused the child to be **without essential parental care**, control or subsistence." *Geiger*, 331 A.2d at 174 (emphasis added). The family court

---

[7] The May 2013 drug screen also yielded positive results for oxycodone and marijuana. Petition at 11.

held that clear and convincing evidence, **see L.M.**, 923 A.2d at 511, in the form of Ms. Migliazza's and Mr. Hill's testimony, established "Mother's inability to cease drug use," which lead to "her **lack of ability to fulfill** her **parental responsibilities**," and thereby satisfied this second element of subsection 2511(a)(2). Family Ct. Op. at 18 (emphasis added). Ms. Migliazza observed that, when E.M.Z. was left in Mother's care while she was under the influence of drugs, Mother did not clean E.M.Z. and he smelled foul. N.T. at 15. The consequences of Mother's drug use on M.M.Z. began before that child was even born. At birth, M.M.Z. tested positive for amphetamines, benzodiazepines, and opiates and, as a result, appeared to be "stretched and flaccid." Petition at 11-12; **see** N.T. at 10-11. Mother's drug use thus affected her ability to provide basic health and hygiene to the Children and, hence, caused the Children to be without essential parental care. **See** 23 Pa.C.S. § 2511(a)(2).

Finally, "it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be **remedied**." **Geiger**, 331 A.2d at 174 (emphasis added). The family court held that "clear and convincing evidence" established that Mother "will not ever be in a position to parent these children," has "failed at any of her goals," and "is unable to **remedy** that situation that brought her Children into care." Family Ct. Op. at 18 (emphasis added); N.T. at 45; **see L.M.**, 923 A.2d at 511.

- 15 -

The record demonstrates Mother's never-ending cycle of drug use and incomplete treatment. Mother sought drug treatment in 2009, but, by 2013, Mother tested positive for multiple illegal or unprescribed drugs. Petition at 11. In 2014, Mother's family service plan provided that she would refrain from illicit drug use and complete drug and alcohol treatment. Again, Mother did not comply, and later that year she tested positive for several of the same illicit drugs. Ex. DHS-5; Petition at 13. Mother was then referred to outpatient drug and alcohol treatment at Wedge, but she failed to attend this program and was administratively discharged for non-attendance. Ex. DHS-5; Family Ct. Op. at 9-10. In 2015, Mother enrolled in another drug treatment program, which she again failed to complete. Ex. DHS-5; Family Ct. Op. at 10; Permanency Review Orders, 5/13/15, at 2. Later that year, Mother returned to Wedge, but, in November 2015, again left that program before completing it. N.T. at 21, 44. Mother provided no proof to substantiate her claim that she attended any drug treatment program thereafter, and DHS presented evidence that Mother's health insurer had no record of any drug treatment by Mother since November 2015. *Id.* at 44. Mother's consistent failures to complete her rehabilitation programs therefore support the trial court's finding that she cannot and will not remedy her situation. Thus, the family court correctly held that the final requirement of subsection (a)(2) was met.

Under Section 2511(b), the family court was required to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." This Court has explained that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into [these] needs." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted), *appeal denied*, 897 A.2d 1183 (Pa. 2006).

The record reveals that, while E.M.Z. was in her care, Mother failed to allow the CUA to assess E.M.Z.'s safety, failed to respond to the CUA case manager's numerous outreach attempts, and did not even answer the door when the CUA case manager knocked, leaving the CUA case manager increasingly concerned about E.M.Z.'s safety in Mother's care. Family Ct. Op. at 5; Petition at 11. Additionally, "[w]hile E.M.Z. was in Mother's care, Mother failed to ensure that E.M.Z. received proper medical care and failed to address [E.M.Z.'s] developmental needs." Family Ct. Op. at 5; *see also* Petition at 11. Mother did not clean the child and may have not even changed the child's diaper. N.T. at 15.

M.M.Z. was removed from Mother's care shortly after M.M.Z.'s birth. However, as Mother has failed to receive treatment or to comply with any of DHS's objectives for her, there is no evidence to suggest that Mother's ability to care for the needs and welfare of M.M.Z. would be any better than they were for E.M.Z. *See* Ex. DHS-5; Family Ct. Op. at 9-10, 14-15, 18;

N.T. at 10-11, 15, 20-21, 44; Permanency Review Orders, 5/13/15, at 2; Petition at 11, 13; *see also L.M.*, 923 A.2d at 511.

E.M.Z.'s "needs and welfare" were, accordingly, not being met by Mother, and both Children's needs and welfare were unlikely to be met by Mother in the future. *See L.M.*, 923 A.2d at 511. The family court therefore properly concluded that it was in the best interests of the Children to terminate Mother's parental rights. *See id.*

Mother argues that "[t]he trial court erred when it found that the termination of Mother's parental rights was in the Child[ren]'s best interests" because "[t]here was no evidence that the bond between the [C]hildren and their mother had been broken." Mother's Brief at 8. We disagree. We have held that assessment of a child's best interests under Section 2511(b) requires the trial court to "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *C.M.S.*, 884 A.2d at 1287 (citation omitted). But we have observed that "[t]he extent of any bond analysis . . . necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). And we have instructed that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008). The well-being and

permanency of a child cannot be tolled indefinitely. *C.L.G.*, 956 A.2d at 1007.

Here, Mr. Hill credibly testified that, although Mother had attended all supervised visits with the Children, which he had observed for a year prior to the termination hearing, he would not classify their interactions as a parent–child bond. Family Ct. Op. at 18; N.T. at 19-27. He further gave testimony that he believed it would be in the best interests of the Children if Mother's parental rights were terminated, because the Children "deserve permanency." *Id.* at 27-28. He affirmed that the Children have a "tremendous" bond with their pre-adoptive family and would not suffer any irreparable harm if Mother's parental rights were terminated. *Id.* at 28. The family court found that, "based upon uncontradicted evidence[,] the only parental bond that the Child[ren] know[] is with [their] foster care parents." Family Ct. Op. at 20; *see also* N.T. at 45-46. The family court's determination on this issue was supported by the record. *See generally L.M.*, 923 A.2d at 511.

Accordingly, after careful review, we accept the family court's conclusion:

> The Court heard testimony that the pre-adoptive parents are willing to adopt the Children and that the Children remain safe, with their needs being met in this home. Testimony was also presented that confirms that it is in the best interests of the Children for them to be adopted. Further, credible testimony was presented that the Children would not suffer irreparable harm if Mother's parental rights were terminated because the Children were not bonded to the Mother. As stated above, this

> [c]ourt finds credible the testimony from DHS and the Agency workers that the Children will not suffer irreparable harm if Mother's rights were terminated and that termination of Mother's parental rights would be in the best interest of the Children.

Family Ct. Op. at 19-20. **See** N.T. at 19-28. We discern no abuse of discretion by the family court in concluding that the involuntary termination of Mother's parental rights was proper pursuant to Section 2511.

The final issue raised by Mother for our review is that "[t]he trial court erred in changing the permanent placement goal from reunification to adoption." Mother's Brief at 9. Our holding that the family court did not err in ordering termination of Mother's parental rights to the Children moots this issue, as a termination of parental rights necessarily means that the Children's permanent placement goal must be adoption, rather than reunification with the Children's parents. **See generally In re S.E.G.**, 901 A.2d 1017 (Pa. 2006) (holding that an agency may petition for termination of parental rights without first changing permanency goal, and noting that evidence considered in termination hearing necessarily overlaps with that relating to change of permanent placement goal).[8]

In any event, we find Mother's challenge to the change in the permanency goal without merit. Mother states that the permanency goal for

---

[8] Presumably for this reason, the family court did not address the permanent placement issue in its opinion. This issue was preserved in Mother's statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b), dated June 22, 2016, at 1.

four of her six other children in the care of DHS remains reunification as a single family, and she argues that this fact shows that the goal should be the same for the Children at issue here too. Mother's Brief at 9.[9] She continues:

> Luckily, the [family c]ourt has found a willing family member who is able to care for the other siblings. This is a close family bound by a strong cultural identity. . . . The [family c]ourt erred in not mandating that [permanent legal placement] be extended to [the Children] so that they too could forever enjoy the continuity of their family of origin.

*Id.* Mother cites no law in support of her argument that the placement of her other children provides a legal basis for overturning the placement decision with respect to the two Children at issue here.

"When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion. . . . [I]n matters of placement for a dependent child, the trial court must be guided by the best interests of the child — not those of his or her parents." *In re A.K.*, 936 A.2d 528, 532–34 (Pa. Super. 2007). Our review of the record convinces us that the family court did not abuse its discretion in determining that the Children could not be safely returned to Mother and that their best interests required a change in their placement goal to adoption. We have reviewed the evidence relating to the Children's best interests in the

_____

[9] Although Mother's Brief states that four of her six other children are now residing in the same household, the hearing testimony was that five of the six other children currently reside together. *See* N.T. at 7, 48-49.

preceding portions of this memorandum, and that same evidence is controlling on the placement issue. In light of that evidence, Mother's wish that all of her children be placed in the same household does not negate the correctness of changing the Children's placement goal to adoption. Hence, the final issue raised by Mother for our review on appeal is unavailing, and we affirm the family court's orders.

Orders affirmed.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/23/2017